Case number 24-3084 from the Eastern District of Arkansas, Raymond Kelley v. Chad Pruett, et al. Mr. Owens, when you're ready, please proceed. May it please the Court, Your Honors, my name is Jason Owens. I represent the appellants in this Qualified Immunity Appeal, Baltimore County Deputies Chad Pruett and Terry Roper. This case arises from a denial of qualified immunity on an excessive force claim. All other claims in this case were dismissed on summary judgment, importantly including a false arrest claim where the District Court held that the officers had probable cause to arrest Mr. Kelley on the early morning in question. My understanding is that the Court declined to apply qualified immunity upon concluding that there were fact issues that needed to be resolved before the issue of qualified immunity could be adequately addressed. That's correct, Your Honor. The Court held that there were disputed facts regarding two issues. One being, quote, the techniques by which these defendants accomplished the handcuffing of Mr. Kelley. And number two, quote, regarding Mr. Kelley's resistance during the period, end quote. We bring this appeal assuming that both of those questions would be decided in Mr. Kelley's favor. Additionally, we would argue that neither of those questions are relevant or material for purposes of- On the record that was before the District Court, how can we have confidence that all the facts that the Court says need to be resolved, particularly the amount of force that was used, could be resolved on the existing record? Well, so I guess maybe you couldn't, but- Because my sense is the Court is saying that there's not enough facts here, or there are facts particularly as to the level of force that was applied that's just not known on the undisputed record. No, I didn't read the Court's opinion that way. Let me try to speak to that. First of all, with respect to the question of whether resistance was used, this Court has held that that question doesn't matter for the purpose of qualified immunity. In the en banc decision in Kelsey v. Ernst in 2019, this Court held that actual resistance was irrelevant. Well, I didn't ask about the resistance. I asked about the level of force that was used. The level of force. Well, the Court said that disputed questions of fact remain regarding what holds and things were used. The level of force wasn't in question. The man was tackled and handcuffed. That wasn't disputed at all. In fact, I think the Court expressed that all that was undisputed. The only dispute of fact that the District Court noted was with respect to what techniques were used to handcuff the plaintiff. The officers testified in some detail that they used specifically trained techniques including a wrist lock, an arm bar, that are trained not only to them but to officers across the country, are used every day in handcuffing every person who is detained or arrested is handcuffed behind their back as the Court is aware. There's no dispute about that occurring. The only dispute was the plaintiff's statement in his deposition. That's in the appendix before the Court. I believe it's appendix pages 139 and 140. The plaintiff said it felt like they twisted his arm. Now, we're talking about the testimony of a plaintiff, an interested party, who is face down in the grass in the dead of night at 4 o'clock in the morning, who's intoxicated and he's describing what he felt. Not what he saw, what he felt. Well, of course, handcuffing feels like your arms are being twisted because you're being handcuffed behind your back. And if you're a larger fellow like me and Mr. Kelly, it feels a little more twisty than a skinny guy might. The point here for qualified immunity, though, is that none of that really matters. Because there hasn't been a case that has ever found that handcuffing a suspect who you have probable cause to arrest behind the back, after he flees, ignoring commands to the contrary, lawful commands to the contrary, after he flees and is tackled, is, as a clearly established matter, unconstitutional regardless of the technique that's used. What can be concluded based on the statement of the arriving officer, the backup officer that arrives, and comments that his observation of the arresting officer was that it looked like he was doing push-ups on the arrestee's back? There was a statement alleged by, again, by the plaintiff's testimony that this officer said that. I believe the officer denied that, although I honestly can't recall it at this point. That means that somebody's got to resolve it. No, I agree. I agree. And what I'm saying is, resolve that in Mr. Kelly's favor. I think at this point we've got to assume that he said that. My take on that is that that's evidence of Mr. Kelly trying to get up. It's evidence of his resistance, rather than anything else. But again, I come back to, where is the case that says that any manner of handcuffing is unconstitutional, behind the back, that any technique used to handcuff someone behind the back, after they've ignored lawful orders to sit still, after the officer has developed probable cause to arrest them, and thus ordered them to sit still, while he searches the vehicle, which was replete with empty beer cans and a whole bunch of other evidence of criminal activity, because the plaintiff was at the wheel of a running vehicle at the time that he was first encountered, takes off and runs, and is tackled by the officer. There's not a case that says if you use this particular technique instead of another to handcuff the person behind the back, this particular hold or maneuver, that there's something wrong with that. Certainly not if they use the maneuvers that our officers testify about, but because there's such limited dispute at all about that, again, the only dispute is the plaintiff saying, it felt like my arms got twisted. Well, of course, he was being handcuffed behind his back. Nothing in the case law says that there's anything wrong with handcuffing a suspect behind the back after you have to tackle him because he ran away from you. In fact, the cases say to the contrary. Kelsey v. Ernst, again, an en banc decision from four issues. Isn't the running also in dispute as to whether... No, undisputed. I know there was a separation. He was hitted for the house. And the video is crystal clear. It's clearly run. The video is crystal clear as well. And so Scott v. Harris would apply even if the plaintiff had objected, but he didn't. He admitted that he ran from the officers. But in Kelsey v. Ernst, again, an en banc decision four months before the events in this case, in August of 2019, this court said, quote, decisions concerning the use of force against suspects who were compliant or engaged in passive resistance, which are all of the cases that I've seen by either the appellee or the district court at most, are, quote, insufficient to constitute clearly established law that governed an officer's use of force against a suspect who ignores a command and walks away. In that case, the suspect had just come out of the community swimming pool. He was in her bathing suit, a woman in her bathing suit. And she walked away from the officer. And the officer tackled her hard enough to knock her unconscious. And the court reversed the denial of qualified immunity in that case, again, en banc. Interestingly, the court held, and I mentioned this earlier, the court held that actual resistance wasn't relevant. She made the argument in that case, and there was a dissenting opinion, I believe, that made this assertion, that when the officer told her not to walk away, she thought he meant just check in with me and then you can walk away. And the court said that doesn't matter. What matters is whether a reasonable officer could have believed that she was, quote, noncompliant. Not even resisting, but noncompliant. And so the only question was the reasonableness or, as the Supreme Court has said, reasonable unreasonableness for qualified immunity in the belief. Of course that is satisfied here in a much more demonstrable and serious way, frankly. A woman walking away in a bathing suit near the community pool is one thing. A man at 4 o'clock in the morning running back toward his house where most people store their guns. I live in Falkner County, Arkansas. Most people store their guns. In the dead of night is a much more serious situation. The fact that he's running instead of walking away reveals a significantly higher intent to flee, to get away from the officer. Kelsey v. Ernst is the controlling law in this case, is the clearly established law, and it says that qualified immunity is appropriate here. A number of other opinions of this court hold the same thing. Hosea v. City of St. Paul, Wordish v. Kruger, Carpenter v. Gage, and Cohurst v. Smith, among others, all say that where someone resists in the form of flight, tackling and handcuffing that suspect is altogether appropriate. And in light of all of those opinions saying the affirmative, substantial case law would seem to be required to rebut that, to create clearly established law in the other direction. Not only is there not substantial case law, there's not any. Mr. Owens, would you agree that when you read the district court opinion that the court does not make, it doesn't find the facts and the like most favorable to the plaintiff, but instead it tells us what the defendants allege factually, and then concludes by saying there are disputed issues of fact, so qualified immunity is denied. Isn't that really what happened here? Yes, broadly. Well, I mean, it either viewed the facts and the like most favorable to the plaintiff, and it tells us what those facts are, or it didn't. And it looks to me like it didn't. In fact, the court said, I'm finding there are disputes of fact, therefore no qualified immunity. And since we can't find facts here on this appeal, what do we do? And we're certainly not asking the court to find any facts. What we're saying is that this appeal is based on the notion that all facts should be found in favor of the appellee. The court did go down through where, in the factual recitation, what the defendant said, what the plaintiff said, with respect to various things. The plaintiff just didn't say a whole lot. And part of that is because there's a video that clearly shows most of this event. And it clearly shows the plaintiff running away from the officer. It clearly shows the plaintiff in an inebriated state. It clearly documents the commands in a way that, even if the plaintiff had denied, Scott v. Harris would say that that blatantly contradicts and the video must be believed instead of the appellee's testimony. I see I'm ending my rebuttal time. If there are no more questions at this point. Thank you, Your Honor. Thank you, Mr. Owens.  Good morning, Your Honor. May it please the court, my name is Austin Porter, Jr. I'm here on behalf of the plaintiff, Raymond Kelly, who is the appellee in this case. On December 25, 2019, Mr. Kelly was at home on Christmas Day. He was cooking his turkeys and trying to get ready for Christmas. Had been up all night, asked his wife whether or not she had gone to get the mail. The wife said, I hadn't gone to get the mail, she forgot. He gets in his truck, bags down his driveway, which is about 100 yards, gets his mail. Then he pulls up, looks at his vegetable garden that's on the left, there's a brick wall over there, and apparently he falls asleep. Officer comes up, this is Officer Pruitt, asks if he's all right. Of course, my client said, yes, I'm fine, how are you doing? Basically, the officer asks for my client's driver's license. My client gives the driver's license, he runs the check, finds out that my client lives where he lives, which is 41 Friendship Road in Conway, Arkansas. Mr. Pruitt then asked my client, Mr. Kelly, to get out of the vehicle, which he did. Mr. Kelly is protesting, I'm at home, this is my driveway. I'm in my private driveway, I haven't done anything. He goes and does what the officer said, he gets on the wall. He's asking if he can call his wife, so his wife can verify his story. The officer said, no, you can't call your wife. Pruitt said, you can't call your wife. Then Mr. Kelly wants to, I'm sorry, Mr. Pruitt wants to do a search of Mr. Kelly's vehicle. I contend that was an illegal search, but it's not really what we're talking about. So he begins to search his vehicle, found an open can of beer and found some other cans of beer that had been emptied. Mr. Kelly tells him, I say these cans and I sell them. Mr. Kelly has a farm. This, Your Honor, is not a case about a tackle of a 70-year-old man. This case is not about handcuffing this 70-year-old man. What this case is about is what the officers did once they got Mr. Kelly on the ground. Mr. Kelly is face down on the ground and the officers were able to get his hands behind his back. Then Pruitt comes along and Pruitt, in his statement, which is a transcribed audio recording, it's in the appendix, I think, page 23. I'm not sure about the numbering that Mr. Owens had about this appendix. But Deputy Roper said, I didn't know he would. I just held his arm and started going up until he quit. He will quit once you get up there a little bit. Sometimes you have to do what you have to do. And then Roper said, when we pull up, I thought you were doing push-ups on a guy. In other words, Officer Roper said he thought that Pruitt was doing push-ups on Mr. Kelly. Again, 70-year-old man on the ground with these two officers on him. Mr. Roper takes Mr. Kelly's arm and he's bending it as far as he can go. And when Mr. Kelly felt his arm pop, he yelled in pain and he said, man, you broke my arm. That's not an approved proper technique. Techniques, Your Honor, can be abused. And it's interesting to note that in the appellate's brief on page 7, they argue these techniques are used without incident or injury all the time by law enforcement. And so in other words, if they are done properly, then what the appellates are saying, there is no injury. So obviously it was done in an abusive manner. And so that's the question. In the case of Jackson v. Stare, 944 Fayette St. 704, 2019 case, that was decided before this case happened. The court said you kind of have to look at things frame by frame. In that situation, I think it was Mr. Jackson who was being arrested by these Jacksonville police officers. And he was arguing with the officers. And then the officer said at one time Mr. Jackson raised his hand in an attempt to hit an officer. And then that's when he got tased the first time. And then he went to the ground. And then the second time he was tased. And then he gets up on his knee and the officer tells him to get on the ground. And then he's tased a third time. This court held the first tasing was fine. The third tasing was fine. But the second tasing should not have occurred and it violated the Constitution. What this court, what the district court is saying is that there were disputed facts that could not be resolved because there was no audio recording of the actual takedown of Mr. Kelly, of what occurred. We contend that the officer violated Mr. Kelly's Fourth Amendment right when they violently twisted his arm up behind his back in a manner that caused him injury. And that was totally unnecessary because they had his arm behind his back. All they had to do was put a handcuff, put the handcuffs behind his back. Were both officers involved in the handcuffing? Yes, sir. Yes, sir. Both officers were on top of Mr. Kelly. And Mr. Kelly contended when these officers were on top of him, he was not resisting. That's the question of fact. Was Pruitt given qualified immunity? I believe he was, Your Honor, if I'm not mistaken. I think he was. Both officers. What's the distinction between the two in terms of conduct? Conduct, Pruitt, Your Honor, we believe was the one. Again, Pruitt was the one. He was the second arriving. No, no, I'm sorry. Officer Roper was the one who came on the scene second. Pruitt was the initial officer, if I'm not mistaken. And so they were both involved in the restraining of Mr. Kelly. They were both involved in pulling Mr. Kelly's arm up so far. And then, of course, in Roper's situation, he said that he had to pull it up as far as he can go until they get him to stop. And then he said, you know, sometimes you just have to do what you want to do. Have to do. And so the court, Your Honor, in this case, in the reasoning, the court said, we don't have a video of what happened. There's a dispute as to whether or not Mr. Kelly was resisting. The court said the body camera video evidence of this event does not conclusively show what conduct any party engaged in giving rise to this specific claim. In other words, the court cannot determine from the video evidence what techniques Deputy Pruitt and Roper used during this arrest or whether, if so, to what extent. Mr. Kelly, to what extent Mr. Kelly resisted the arrest once Mr. Kelly stopped retreating up his driveway. And Mr. Owens contended that was a run. This is a 70-year-old man who's in his driveway, which is 100 yards. The video showed that he may have taken four or five steps trying to go up the driveway. And he was tackled. There was no run as far as I'm concerned. You know, he tried, certainly he tried to go away from the officers. He's clearly trying to flee. Yes, sir. I have no question about that. I agree with you, Your Honor. I think he took about four or five steps and he tried and he was tackled. I'm sorry, go ahead. So my concern, and it relates to an argument Mr. Owen made, is that the Supreme Court has frequently said you can't look to determine clearly established at too high a level of generality, right? And here the district court sort of just said, well, using excessive force is improper. And, of course, that's true. But you have to do that in the circumstances. So what case makes it clearly established that whatever you contend the technique was, after someone flees, was clearly a violation of law, was clearly excessive force? And I think, Your Honor, the case of Henderson v. Munn is instructive here because in that case Mr. Munn was resisting initially. He was resisting and then, of course, when the officers got him under control, then one officer took a baton and hit him on his ankle and broke his ankle. And then, of course, after he was handcuffed he was tased. In this situation Mr. Kelly was under control. Both officers were on him. They both had his arm behind his back. All they had to do was just put a handcuff on him. But one officer decided he wants to lift Mr. Kelly's arm up as far as he can go. And we contend that that is not a proper technique that should be used in this situation. That was an abuse. Is there any case that says that? Well, Your Honor, again, the case law, again, Munn said that you can't abuse a person once you have that person under control. There don't have to be a case on point in this situation. These officers were clearly on note. You can't just twist somebody's arm or bend someone's arm as far as it can go until the point where it may break. I mean, any officer with common sense knows that you can't do that. That is an unreasonable seizure to do something like that. And so that's why we contend that his Fourth Amendment was violated in this case. And, again, the appellants in this case said that, well, these techniques are used all the time and nobody is hurt. Well, when you abuse someone, it's kind of like the situation when Officer Chauvin had his knee on George Floyd's neck for nine minutes. I mean, that was clearly an abuse. He may have been taught that as far as the academy is concerned, but you certainly can't just put a knee on somebody until you snuff their life out. And in this situation, Roper even admitted that he was bending Mr. Kelly's arm in such a manner that it was just going as far as he could go. And then when Mr. Kelly felt his arm pop, he just thought that his arm had been broken. And it was seriously injured. When the ambulance people came there, they noticed that it was seriously injured, that this man needed medical attention. We're also overlooking the fact that the appellants intend that Mr. Kelly was intoxicated. There was no proof of that. He wasn't drunk. There was no test done. He was charged with public intoxication on his very own property. And when the prosecutors obviously realized that they couldn't make a case, the charges were dismissed. You charged a man with public intox on his own property in his own driveway, which is ridiculous. And again, Mr. Kelly kept telling them, all you've got to do is call my wife. She'll tell you. She'll confirm my story. And the officer just would not accept that at all. And so again, there are facts that the judge said are in dispute. And I also contend that this case, that the court really didn't have jurisdiction. I mean, this is an interlocutory appeal. And the appellants don't like the facts, how the facts were determined by the judge. And they're simply saying, we don't like how the judge determined these facts. Well, isn't that the real problem? The district court didn't determine any facts. Well, I just went through the court's opinion. And what I read is her recitation of what the defendant contends and then what the plaintiff contends. And then the court says there are disputes of fact. I agree with you on that. So for us to verify what counsel, both you and opposing counsel, have argued this morning about what happened and about what the evidence is, we would have to go through and examine, I don't know exactly what kind of procedural submissions exist in the case, but if depositions, affidavits, we would have to go through and look at those and compare them, wouldn't we? And that's why the court didn't have jurisdiction to do that, Your Honor. Because when you try and, this court is not here to look at the facts. This court is not here to go through the records because that's already been done. Again, when there are genuine issues of material fact, summary judgment is inappropriate. And that's why the court said, well, the court said, I'm kind of scratching my head about what happened. And so we need to have a jury to determine. We need to have a jury to weigh the credibility of the folks who were involved. And that's something for the jury to say, to make that determination. And again, I think it's Thomas versus Talley where it talks about where, again, when you're dealing with an interlocutory appeal, the appellate court is not in the position to try to figure out what the facts are. Because that's something that's left to the purview of the judge. Or in this situation, if the judge can't determine it, that's something that's left to the jury. Mr. Porter, would you address the Kelsey case that the appellate relies on? I'm sorry, Your Honor? The Kelsey case that the appellate raises as being the authority for the officers that would support the actions that they took. Your Honor, I don't think the Kelsey case is as far as applicable in this situation. Because I think you're talking about simply a handcuffing of a person. And certainly, whenever you have a handcuffing situation, you may have handcuffs that may be too tight. But again, in this situation, we're not talking about a simple handcuffing. We're talking about a situation where an officer just took a person's arm and twisted it almost to his head in an attempt to do harm to the person. And so I just don't think that's controlling here, Your Honor. I think I'm about out of my time. Does anyone have any questions? We ask, Your Honor, that this court affirm the decision of the trial court and allow this case to proceed to trial. Thank you. Mr. Owens? Let me begin by trying to respond to Judge Shepard's question. In Johnson v. Jones, the Supreme Court explained that because of its repeated cautions about how important facts are in these cases, they would expect district courts to ferret out the facts in some detail in those cases. Where they do not, Johnson v. Jones said, the appellate court, for better or worse, and this is the Supreme Court saying this, is required to engage in what the Supreme Court called a cumbersome review of the record to determine what facts the district court likely assumed in reaching its factual conclusions. I think that's where we're at. We're in that Johnson v. Jones scenario. Regardless of what facts the judge assumed, there is simply no case. The problem is here, the court told us it found no facts. It says there were disputes of facts. There are disputes of facts. So I find no facts. There are disputes of facts about two questions that are legally immaterial for purposes of qualified immunity. Both of those questions are legally immaterial. In Kelsey, this court explicitly said the question of actual resistance is legally irrelevant. The question is whether a reasonable officer could have perceived the conduct as resistive or unreasonably in the qualified immunity language. The only case the plaintiff cites here is Henderson v. Munn. Henderson v. Munn is a case where a person was pepper sprayed after being handcuffed. There's simply no case that says that if you use a magic word like my arm was twisted, that somehow you get to beat qualified immunity every time. There's no case that says that particular handcuffed maneuvers are prohibited in a case like this. The Supreme Court has recently reminded us all that a totality of the circumstances analysis is required in these cases. The totality here is that we had a man sitting at the wheel of his vehicle, which is DUI in every state in the country, inebriated. The court has already held we had probable cause to arrest him for those offenses, including public intoxication. That he was told to sit still, nevertheless got up and fled, was tackled and handcuffed. The fact that the plaintiff's counsel eloquently says that it was too hard doesn't trump the qualified immunity requirement that there be a case on point. There's simply no reasonable notice here we would ask the court to reverse. Thank you, Your Honor. Thank you, Mr. Owens. Thank you also, Mr. Porter. The court appreciates both counsel's participation and argument before us. We will continue to study the matter and render a decision in due course. Thank you.